Here to give you the Honorable Public Order of the 2nd District is Bethany Session, pursuant to adjournment, the Honorable Anne Bracken, George C. DeVos.  Your Honor, before case of the morning call, Martin Fishman v. Hall v. Fox River Commons Shopping Center and County's Food Products v. Fox River Commons. On behalf of me, according to this accelerated case, Michael Lacey is representing Fox River Commons Shopping Center. Mr. Dennis Waldron is representing Martin Fishman, Chicago title. Mr. Patrick T. Costello is representing County's Food Products. Gentlemen, are you all ready to proceed? Yes, sir. And is there an agreement as to allotment of time? Yes, there is. Okay. Counsel, as you wish. Good morning. Again, Mike Lacey on behalf of his opponent, Fox River Commons Shopping Center, LLC. Judge, what I'd like to do, given the time constraints, I'd like to begin, if it's to please the Court, addressing the unreasonable holdings and consent issues presented in case number 05-MR-620-M07-L-101A. Specifically, I'd like to begin with the denial of consent Chicago franchise. And the issue I'd like to make there is that this was, if you're all aware, a land lease upon which a building was built. And there's now the current tenant of the building lease would like to assign it to a subsequent tenant. This had been done three times before, from Bertucci's to County's Pizza, to County's Food Products, and now they want to assign it to Chicago franchise. Your client sent the letter of rejection on 225-05, correct? Correct. Was your client aware of the 131-05 termination of the agreement? I don't believe he was. I don't know. Not at that time. County, or Chicago franchise itself was offered the opportunity to sign an assumption agreement, refused to do so. Fox River didn't deny the assignment. Chicago franchise refused to do so. It was required. The same thing was done by the prior tenant on the building lease. Nevertheless, the Chicago franchise went forward and submitted a proposed affinee to Fox River Commons for the building lease, for their approval. Now under the law, as it's stated, the affineur, or the tenant, has the obligation to provide the landlord with enough evidence that the proposed affinee has financial wherewithal to go forward, has the wherewithal and experience to operate the business, and that he is ready, willing, and able, at the time of request for the assignment, to move forward. In this case, the only documentation that was provided, and there was an exhibit in the trial level, was a letter on the proposed affinee, 55.1 investment group inch. Please, of course, from here on out, we refer to it as 55. And 55 provided a letter that said it was $500,000 to invest in the project. It was not notarized, not signed by an attorney, not certified by a CPA. This is what they provided Fox River. This wasn't the first assignment of this lease, was it? No, sir. This would have been the fourth. Was this the first time that Fox River had ever asked for financials? In this particular case, yes. So this is the fourth assignment, and there were three prior assignments that Fox River said, we'll take your word for it. But this is the only time that the proposed affinee refused to sign the assignment agreement. Now, the prior one that refused to sign the assignment assumption, he may well have asked for the financial statements, but that never occurred. Everybody, because it's in the land lease, signed the assignment assumption immediately. But Smith's group was an assignment. Pardon me? Smith's group was an assignment, correct? I can't hear you. I'm sorry. Smith's group was going to sign, correct? No. We never got that far. You never got that far on this one, but did the Fox River give some indication that they weren't going to accept this assignment? After they proposed, when they met with Smith, the only documentation to demonstrate their financial wherewithal was a piece of paper that said they had $500,000. They didn't know they were going to pass that. Didn't you make a concession on page 30 of your wife's brief that the initial startup cost would have totaled $483,000? We believe that's correct. A minimum, that was our estimate. Maybe they had $500,000, but he never proved he had the $500,000, which is a piece of paper and his letter had to have $500,000. I thought it was $500,000 or more. Pardon me? I thought the letter said $500,000 or more. $500,000 indicated he may come up with more, but he never offered to. And that's the question. If he were to come up with a reason, put up the money necessary to build the facility, there wouldn't have been an issue. The problem was it was $500,000 is all that he offered to put up. The court held and put a great deal of emphasis on the fact that he proposed how we, the guys from Chicago Franchise, maintained that the members of the Smith Group, the 55, were wealthy. The problem was that he couldn't name who these wealthy investors were. He couldn't tell us whether or not the wealthy investors were going to stand behind the project. He admitted that he did not give any financial information about the wealthy investors or the Smith Group to Fishman, to Stolfi, which was Connie, or to the landlord. He didn't know what information was given to the landlord. The landlord, the only thing in the record that is acknowledged the landlord got was this letter saying I have $500,000. Now the fact that these guys are wealthy is irrelevant. The case law is very clear. It's not enough to have wealthy investors. You have to have healthy investors who will stand up and say I will use my wealth to support this business. That was never done here. What fact does it play in that you had four other entities that were guaranteeing this lease, other than 55? Well, we take guaranteed jobs. That's what we're referring to in the assignment and assumption agreements. That was required under the land lease, that any asset needs signed and signed an assumption agreement. So each one did so. But there's no requirement after there's four or five or six that that's waived. But you can certainly go after them if, in this case, the Smith Group didn't pay what they were supposed to pay. You had four other people you could have gone to, correct? You had Fishman. No, it's an assignment assumption. It's an assignment assumption in the building lease. The landlord doesn't become a part of that lease. So it's true that Fishman could have accessed each one of them to get his money to pay the landlord. But I don't know if the landlord, by agreeing to the assignment of the building lease, had the right to go after them directly. And the landlord's concern is not only that the money gets paid, but the landlord has a concern that he's got an empty building, empty shopping center, for an extended period of time. People go to shopping centers to cannibalize each other's customers. So was it their view to put somebody in there so you didn't have an empty shopping center? That's correct. And that was the reason for Lisa's financial responsibility and his insistence that they meet these requirements. They had leased it to Fishman, and Fishman wanted to sell Lisa to the landlord's benefit. And the reason for these requests for an assignment agreement, that the person who's going in that building now has the ability to always have the ability to proficiently operate a viable business. In this case, none of the information is provided. I mean, a letter saying I have $500,000 is just not adequate. How about Mojito? Well, Mojito is, you have a letter that was sent by Mojito's attorney, I believe. The thing about Mojito is the information in the application was signed by Mr. Mojito, not Mr. Mojito, Mr. Rios and his wife, his proprietors. So Fox River analyzed the data that was furnished. Now, you have to understand that he gave that data furnished. Actually, it was furnished for three different entities. All with different IVP numbers, and none of which Mojito's owned solely. They were other investors. But they furnished this information as a demonstration of their financial wherewithal. Then he offered a personal financial statement, which was just that. A piece of paper where he could tell what he thought it was worth. And then he gave his profit and loss statements for the restaurant at the time. Now, Fox River analyzed this and sent it back to us, and we got problems. First of all, he's been in business for two and a half years. He's only going to profit in this one month. Second of all, you've got a net worth of $300,000, but your proposed construction budget to redo this facility is over a million. Now, if you're going to have to borrow, we assumed it was debt because the equity was only $300,000. The equity provided. There's the tenant that has the aggregation providing information to the landlord. It's not for the landlord to go looking for. And based on the information provided, they were short. And then we assumed it would be debt. And the landlord wrote back to the attorney and said, we have a problem. He says, this will never survive if you have to undertake this amount of debt. Now, the attorney wrote a letter back, I believe Mr. Costello, where he said his analysis of business is right. His analysis of my client's net worth is correct. Where he has an error that we do not intend to finance this with debt. But we're going to use equity. Okay. Where's the equity coming from? Now, Connie's going to brief us. He had access to capital. Where is it? The access to capital trial was simply that he was going to hire a guy to go out and find the money. They had no investors. They no longer had access to capital. They had somebody who was going to go out and find and shake the trees. Okay. You have to have ready, willing, and able. You have to have access to that capital at the time you ask for the assignment. You can't say to the landlord, I'll get back to you. Okay. Aside from that, the business he was operating was struggling. It had been in Chapter 11 bankruptcy. Did your client know that? My client didn't know that, frankly, for lack of a fact, John. My client didn't know, no, he didn't know that for lack of a fact. What my client did know, having meeting him at the restaurant, is that they had the restaurant, that they were in the club or the cafe rumba. He was going to take a job with Hilton, and then he was going to undertake this $1.7 million construction project. Well, how was he going to do all this? He said, well, he wasn't going to actually run the store. He was going to supervise it. He didn't have the money, and his experience as a proprietor wasn't very good. I mean, he was just struggling to survive. He did very well in the corporate setting. There's no dispute about that. He was in the corporate setting for several years. And he had a nice restaurant. But nice restaurants don't pay the bills. It's nice restaurants that are pretty, that have a steady customer base, that pay the bills. And it didn't look like he had the finances to do this. All this Mojito stuff happened after this memo that was from, a memo within the landlord, from Nomura to Demucci, maybe? Well, Nomura, within a building. Let me finish my question. The 318.05 memo that talked about fairly blatantly that we almost had this building. We had this $1.5 million building that was built and we're going to get for nothing. We're close to that. Am I misreading that memo? He said he didn't think when he was in there. Let me clear something up about the $1.5 million building. Fishman only paid $225,000 for the building. Now, he bought it from B&B builders, the people that built it. And he maintained that's what it cost to build it. But Fishman himself only had $225,000 in the building. Say it was worth $1.5 million in stock. Something's worth what somebody paid for it, and he paid $225,000 for it in the mid-'90s. Let's come back to that letter that Justice Berkley was talking about. In the letter, your people basically explained what you mean. Lease would expire, Fishman could take possession, and then Fishman's probably not going to want it, and then we'll get a possession. Didn't they say that? Well, I don't deny that that's what would happen in the release terms. But didn't it? Could you understand how one can perceive that that letter was almost a scheme, if you will, of sorts, to deny other people coming in so that Fox River could eventually get this building back? Judge, those were the terms of the release. And one way to work your way out would be somebody who clearly had the financial will as well. Well, he didn't. He just didn't. I mean, his own account said, based on the information that was forwarded to Numero at Fox River, his analysis was correct. Yes, I only had $300,000. Yes, the building was going to cost a million. Yes, my business was unprofitable for the first two and a half years. Okay, he knew that. They knew he was going to take a job. He had a struggling business. They hadn't made money in two and a half years. Okay, granted, if this guy was well-financed, a great authority, had money, and in which he said no, I would believe this scheme. But the fact of the matter is that the people produced were not able to operate the property. Was this all going on when the building was shut down? Yes. And so your client, as you said, desperately wanted somebody in the spot. And the building is closed. It's not like Congress is going out and trying to find somebody. This place is closed. Well, I'm not saying that. I don't know how hard they were trying to find somebody. Well, I'm just saying the place was dark. It was dark until – and that's another issue, too. It was dark until May of 2005. It reopened. It reopened as a carry-out, despite the fact that the lease requires 100% capacity of the building. Were they still paying the rent? They didn't pay the rent to us. They paid the rent to Fishman. Fishman paid us our rent, yes. Correct. So whether it was a carry-out or whether it was a restaurant, it was the same. That's not a requirement of the lease, though. It was a violation of the property. It was a sit-down 100% restaurant. They tried to do the 10,000 square foot building for a carry-out. Then they closed it again in July, and it remained closed for several months after they did some restoration. The trial court made a finding of unreasonableness, correct? Your client was unreasonably withholding consent. Right. Okay, but wait. I'm sorry. And that's after a full trial, after hearing all the things you're telling us about, and also knowing that there are other people on the hook for this lease. You said just Fishman on the land lease, but Fishman could have brought in the Bertucci's and these other people on the other assumptions. I mean, Fishman theoretically could have brought those in. So, I mean, the trial court was aware of all these facts and made this finding of unreasonableness. I mean, that's entitled to deferential review by us, is it not? I believe so. I mean, it's got to be against the manifest way of the evidence, that data finding of unreasonableness. I don't disagree with that, Judge, but based on the information provided, I mean, how could you find who was able? He had no capital. I mean, he had no capital. There was no evidence in the record that he had the wherewithal to be ready, willing, and able. The trial court found him. On what basis? The guy said he'd never even tried to get the capital after he got the letter notifying him that Bertucci wanted to see where the money was coming from. So, I'm sure of it. I'm sorry. So, no capital. And the next tenant is Scabbo Restaurant. Now, Scabbo, the attorney for Scabbo is a gentleman named Ed Weinman. Ed Weinman is a local attorney. He's never brought in the court. Okay? All you have is the information in the record where Mr. Costello writes to me, I understand we're approved and we move forward. I wrote a letter back to him, and I said to him, well, that's not the case. Mr. Scabbo Wanderling wants an approval from Corrales. Now, we are all in agreement that we didn't need a letter from Corrales. The counsel argued that in the briefs. The judge held, and I believe mistakenly so, that he said the rejection was due to our improper reliance on the Corrales lease. We didn't reject Scabbo telling him. There wasn't a piece of paper that said there wasn't any testimony to that effect. Matter of fact, Connie's present. Mark spoke. He said he believed the reason they didn't go forward, Scabbo didn't go forward, was because he was afraid that they were running into a conflict with Corrales and wanted to avoid it. That is our understanding also. They decided not to go forward. Let's move forward since your time has ran out, but I want to hear your remaining argument concerning the acceptableness of the damage award. Which damage award now? Connie's or the Fishman? Yes, Fishman first. Well, Fishman, it's not the law, okay? You're entitled to guess what you're going to lose as a result of an intensive breach. The damage award here is he wants the amount of rent he was charging Connie, including Cam and taxes, which is the maintenance and the real estate taxes. So you're submitting it was a windfall? No, sure. If he collected it, if there was a windfall, this is what he would get. He would get his rent from Connie, he would have to pay FOXFER with their rent, and he would also have to pay FOXFER with Cam and taxes. Well, he wants to keep all that. And my argument is he's only entitled to the difference between the base rent that Connie's paid him and the base rent he paid FOXFER. The Cam and taxes, he's not entitled to, nor is he entitled to a credit for what he would otherwise have to give the landlord. As far as Connie's claims, I think the trial court had it right in the first instance that we breached or we were found to have unlawfully interfered, and from that point forward when Connie left the premises, any obligations he had to fishermen were damages that had been incurred by FOXFER. In fact, the trial court decision was upheld. Connie is now asking for damages for the rent from the time that led to the default or the choice of interference until the time they left the property. Well, you can't claim a material default, stay in possession of the property, operate your business for a couple of years, come to the conclusion, you know what, this isn't working, I want them to give me my rent back. But did they have a choice? I mean, if you wanted a company in the building, otherwise they would have breached the lease if they weren't in the building, but their argument is you wouldn't let anyone else in the building because you were unreasonable in the individuals who they brought to you, so did they have a choice, FOXFER, to stay in that building and pay their rent? But ultimately they did leave, didn't they, Your Honor? And that's what they should have done with the person. The benefit of the lease is not whether you're making money or not making money. The benefit of the lease is possession. They retained possession. What they did with that person is up to them. We have a duty to mitigate. We cannot mitigate if they're in possession of the property. Well, you had a duty to mitigate, and they're submitting that they attempted to help you mitigate and you were unreasonable. But that's with all due respect, that is not their decision to make. Okay? We have the obligation to mitigate. They have to let us. If they choose to stay, there's a business decision they have to make. They did get the benefit of possession of the property. I know I'm running over. Can I continue? I think the only issue that I wanted to address was the eviction, and maybe we can do that when we come back up. You tell me, Your Honor, whatever suits you. Justice Jorgensen, do you have a comment? We can address it now. No, why don't you go ahead. We specifically set this as our last argument to allow as much time as is necessary. So if you want to address that now, that would be fine. Okay. You had the 2005 eviction and the 2008 eviction. Right. Okay, the 2005 eviction, summary judgment is granted on behalf of the cons and fishermen. We had filed a motion for substitution of judge. It was denied. We appealed, and this court reversed. Subsequent to that time, we filed another forcible entry based on this was a predicated when Connie didn't have to leave the building, and fishermen keep paying rent and there was no operator in the building at all. So we filed forcibles. Let's talk about the notice that seems to be an issue. The notice, Your Honor, is clearly no vote. So you're either going to accept the fact that we did not, and we know the argument, that we complied strictly with the forcible act. This case, though, to the extent notice is notice. This is commercial. It's not residential. Notice is notice, and if they hadn't noticed, the purpose intended by the act is served. We believe that's particularly relevant here because just prior to the 2005 forcible, we had been going back and forth between attorneys regarding consent, the lack of consent to the Smith Group and Chicago Franchise. We sent Connie's notice to counsel, and we faxed Connie's corporate office. We believe from our standpoint in regard to Connie's that we met the ethical standard. If not in technical compliance, certainly the spirit was compliant. How about with respect to fishermen? With respect to fishermen, fishermen, by his own choosing, decided to put it in a trust. Title to the property, the tenant was a trust. Now prior, when he put it into the trust, he did what he was supposed to do. He sent us a notice and said the current tenant is now the A&B Trust. That's the last notice we got. We go to file his lawsuit. We can't find the trust. A&B is gone. We don't know who the actual tenant is. Well, he's claiming because of the delay of getting notice that that is our fault. But when you don't abide by the terms of the lease, which specifically provide that he's supposed to tell us when he's signing the lease, you can't claim protection under that. They did get notice, and hopefully they had the opportunity to address it. And Connie did. The fact that you sent both notices to fishermen, the 5-day and the 30-day at the same time, did you comply with the requirements of the land lease? Did we comply ultimately, Judge? Yes. Was it timely when it was given to fishermen? No. But the delay would be because we never did find out who the actual tenant was. And so the lawsuit was filed, fishermen was brought in, and then we found out, hey, it's CT&T. It's not A&B anymore. So they didn't tell us. We didn't go find them. And that's why the notice to them is delayed, and we believe under these circumstances we've complied. The one last argument I would make, if I could be permitted, is regarding the blast-scale force rule. The issue was we prevailed on that in summary, Judge, when possession was given to Fox River. Fishermen remained in possession. Now, when County brought the property, they gave the key to the fishermen. When the property was given to the fishermen, they didn't give us the key. In correspondence we had fishermen maintain that there was a settlement agreement, and that until we were able to learn from someone, they wouldn't give us the key. How to put it was I have the key to the tenant and the payment for the settlement. Are we talking about the attorney's fee? Yes. No, no. There was a proposal by the fishermen whereby we would settle the issues between us. Fishermen thought we had a deal. Fox River did not. Fishermen filed a motion to enforce a settlement agreement. It was denied. Okay, so we filed a performance. Anyway, when the keys were given to the fishermen, he didn't give us the keys. Okay, you only have to sign the letters, and then we'll give you the key when you pay the fee. Okay, now Fishermen's brief says we didn't do anything. Now, what we did is we filed an action for the tenant entry to get possession. He answered the complaint. Not only did he answer the complaint, but he filed several affirmative defenses and a counterclaim. But he said we weren't trying to get possession of the property, or he didn't know we wanted possession of the property. This is simply not accurate. And the final comment that we'll make on that is so long as he stays in possession and deprives the landlord the right to possession, he's got to pay the rent. Now, the trial court held that because he was trying to mitigate, he shouldn't have to pay the landlord. I frankly don't understand that. He stayed in possession. He wasn't paying the rent. And the judge held that because he was trying to find somebody else, he was somehow assuring his default. We didn't lease him the property to find us a tenant. Okay? Fox River Cottings is a shopping center. They had people to find tenants. He was leased the property to occupy it on a continuous basis, either himself or if he chose to find a tenant, he could use a tenant. For him, inability to find a tenant is not an excuse for nonperformance under the lease. He didn't pay the rent. He didn't operate in accordance with the lease. You were given possession. When the rent stopped being paid, once we were entitled to possession, we were entitled to rent. And that is our position. And I thank you so much for your patience. Thank you. Thank you. Good afternoon. Good afternoon. Please support Dennis Walden for Mr. Fishman and his trust, Applebee's and Cross Palms. In terms of the timing, I'm going to address both the Applebee's issue and the fees issue briefly. We obviously rest on everything in our prints. And Mr. Costello will also speak on the Applebee's and there are some of the same issues. I'm kind of lighting that up a little bit. With regard to the Fox River appeals, we obviously believe that all the judgments should be affirmed. I think an important point is the standard of review, as was mentioned. This was a bench trial. There were nine witnesses. Judge Popejoy, in the first pair record of his findings of fact, said having considered the testimony and observing those witnesses' manner and demeanor while testifying. This is not a case that was just on the papers. It was just on argument of counsel. And as we stated on the standards of review, it has to be, to be overturned, it has to be as the manifest way to the evidence, when the opposite conclusion is apparent, and where the findings appear to be unreasonable, arbitrary, or not based on the evidence. Clearly, we did. Let's look at that, the standard that we're using, and when we review the money, the damages paid to Fishman, as I discussed with your opponent, the windfall, if you will, based upon the Gambino case. Wasn't your client supposed to be placed in as good a position as it would have been, in the absence of the wrongdoing? Wasn't he placed in a better position? He didn't have to pay the PM fees. He didn't have to pay the rent. He paid nothing. The court didn't take into consideration, didn't subtract any of the expenses. All right. Well, I'll jump on that a bit. I think it was a little later in the outline. That's the beauty of these public courts. I know that. Throw this outline away. The building lease, the land lease, and the building lease, two separate leases. Okay. That's point number one, with separate obligations, separate responsibilities, separate liabilities. Just think, if the Connie's were to say at some point to Mr. Fishman, you know, you're having a problem with the landlord, or I don't think you're taking my payments and paying them on delay, Lord, so I'm going to stop paying you under my lease. Okay. That doesn't work. He's liable to pay those monies to Mr. Fishman. In addition, there were three claims, and this is the 2007 case, or the 2005, 2004, 2007, and so forth. In the 2007 case, besides the breach of contract, unreasonably withholding consent, there were also a tortious interference claim and a breach of a quiet enjoyment claim. Judgment was rendered in favor of Fishman on all three counts, and that measured damages. He can't recover three times, but it's a measure of damages for three separate things. And Fox River's conduct prevented Mr. Fishman from getting those monies from Connie's. The other thing is, in thinking about that they are separate contracts, separate obligations and liabilities, in the 2008 forcible, Fox River was seeking to get the rent from Mr. Fishman, the monies that Fox River seeks to offset. The judge found that Fox River was not entitled to those rents because of the material breach doctrine, because of the unreasonable withholding of consent back in 2004 and 2005. It happened before. Mr. Fishman paid up through spring of 2008. But he remained in possession. Well, Mr. Fishman is a retired attorney. He's not a restaurant operator. So couldn't he have turned the keys over? It's our position that the keys were tendered. It was our position that there was a deal. This was Section 5, Account 5, I'm sorry, of our 2007 case. And we saw a specific performance of that deal. The judge found a non-meeting of the minds and so forth. But at all times, Mr. Fishman, there was nobody in possession. It was empty. And this goes, again, to the 2008 case. Operating a restaurant in that building does not mean that no one is in possession of the building. Mr. Fishman was in possession of the building. Well, another factor is, and this is pointed out by them, in the 2008 forcible, you know, forcible doesn't deal with ownership. It deals with possession. Fox River had possession in 2008. It was November 2008. They had possession, and they didn't do anything. And as the judges find, in fact, no brokers, no attorneys, no publicity. And that goes to the failure to make damages in the 2008 forcible issue, as well as tied into some of these other issues because they're all interrelated. We're talking about the time from when Connie's moved out to the time that Fishman gave over possession to pursuant to the court order, correct? Is that the time frame we're talking about? Because before that, Connie was paying all the rent. Connie's paying rent on April the 8th. Right, April the 8th. And then Fishman was passing on whatever he was supposed to to Fox River, correct? The rents and the taxes and the cabs. Up until that time, yes. Up until April the 8th. So we're really talking about April the 8th to, I think, May of 11th. Correct, yeah. That's right. Now, the forcible case law tells us that if you remain in possession, you still have to pay rent, unless it's an implied variation case to talk about a breach of warranty of habitability. But other than those type of breaches, if it's a breach other than that, then you're still on the hook for the rent. Well, no, because, with all due respect, as Judge Bolchoy found, dating back to the unreasonable refusal to accept a tenant, he found that to be a breach of contract. That's the same contract we're talking about. So they breached first. And when you come in to get a claim for damages for breach of contract, you have to have performed all of your contractual duties. And it was found, It was found that they had breached back in 04 and 05, in 06, first. So, therefore, the obligation to pay is cut off under the material breach doctrine. Okay.  I mentioned standard review. Counsel indicated that there's no evidence to show that it was against the manifest way to the evidence regarded as Mojito's group. There was no evidence presented to show that they were ready, willing, and able because they didn't show that they had enough capital to, you know, put the bill through. Okay. Habit is a little more involved in some of those things. But the point is, A couple of points I had with regard, and certainly with regard to the Smith's group, which later opened several restaurants with more cash than would have been required. And the case stated at that instance they would have commercially reasonable standards for this instance, for the Fox River case. But in addition, with regard to your point, and the point that was made by the gentleman's question, Fox River had never before required guarantees for financial information. And, again, is Mr. Fishkin's tenant under his risk? Fox River is acting well, you know, as if they were the tenant. Mr. Fishkin had made every payment from 1999 all the way up to 2008. And, as was pointed out, Bertucci's, besides Mr. Fishkin having paid all his payments, Bertucci's remained liable on the lease. Kearney's pizza remained liable. Kearney's food products remained liable. So bail goes to the unreasonableness. And Mr. Nomura went to the former restaurant and said, this is great, I like this restaurant. Can you say that your opponent stated that they're responsible for the rent, those individuals could be held liable to Fishkin, but not to Fox River? Correct, correct. But if Mr. Fishkin's getting the money, he's passing it on. And he has, consistently. Did your client cancel the agreement on January 31, 2005, with the Smith of 55 group? No, no. I thought there was a letter that actually, you know, it wasn't your client, it was Kearney's, that he went out and advanced the agreement. Yeah, yeah. I mean, and the court found, and the evidence showed, that Fishkin was, hey, all these things were fine. All these things would have been fine. The 2005 forcible, I think the judge was clearly correct, that the requirements to send a notice to a tenant under the land lease, the building lease, and the forcible statute were not met with six weeks of Sunday. And there was never any attempt to send that first one to Mr. Fishkin, to any trust, to anybody. But they eventually knew of it, correct? That's true. And so we got the second notice, and based on the admixture case, they did get the notice. Perhaps the timing was a little bit off. Well, the moment of notice, and the cases say, it was strictly construed in the requirements. And there's a statement in the brief somewhere that, well, if you were aware of the breach, that can go toward them deviating the failure to comply, which is strictly enforced against you. But there's no case loss item at that point, because there isn't any. So that has to be disregarded. Is your argument that that's jurisdiction? Are we talking about personal jurisdiction, personal notice? Are we talking about subject matter jurisdiction? What's your argument? No, I don't think it's personal jurisdiction. Because we appeared, and we didn't get to file a special appearance, right? Right. So you had to comply with the statute in order to win. It might have changed when the five days would begin to run. Right. Upon receipt of the notice. Right. But it was mentioned in the, I think it was the tax reviewer's reply brief, that only one notice needed to be sent. But clearly the lease provides for a 30-day notice and an attempt to cure, and then a 10-day notice, and then by first involuntary and whatever. And they're just not complied with. And the top requirements of all security. Because you actually admitted receiving the note. Receiving the first notice and the second notice at the second time, In the 2008 case, I mean, sorry, the 2007 case, an unreasonable rejection of the proposed S&Es, I think they have to be covered. And, you know, again, if it was being contested and tried, the reasonableness of something, that's clearly a prior effect type thing, where you look at the witness' demeanor and credibility and so forth. You know, on that same line, you also have an appeal that I think we need to talk about now, if I'm not mistaken, and that is on the attorney's fees. Right. Okay. So you just said that if it's unreasonableness, we've got to give a lot of deference to the trial court. It's the same deference we have to give on those attorney's fees, so why do we not give deference on the, we're supposed to give deference on your points, but not your points. Well, no, and I can see there's a difference. On the cross-referred appeals, the standard review is against the manifest way of the evidence. On our cross-appeal for fees, it's abuse of discretion. Clearly, they're two different. Which is more deferential. I'm sure it is. It is, it is. So why shouldn't we give deference to the trial court on that issue when we should have yours? Well, on the trial court, in terms of determining facts and looking at the witnesses and so forth, you look at the totality of the evidence. In the abuse of discretion, it is almost against the manifest way of the evidence, given all the details we provided. And I could jump to that or. . . Everything appears when it determines whether or not the fees submitted were reasonable. True, although unlike most cases, Judge Polkjoy was the judge, presiding judge, for about a year, six and a half years of litigation. And some of the cases talk about one reason the judges have such a discretion in their favor is they're observing the counsel throughout the proceeding. So that's one factor. Another factor, and I'll, excuse me, just jump ahead to that now. Do you want some water? Go ahead, take a minute. No, that's okay. I'm getting near the end. We point out several portions in our brief. When you look at, well, a couple of things are understated on the fees. One is that under the Cruz case, if you have fees that are caused by the other side, that's a factor. And many things were caused by Fox River's actions, including on the whole 2005 forcible case, starting on five, and two appeals, and their first appeal wasn't right because there wasn't a 304A finding. When the notices came out. . . But the second appeal they won. Pardon me? The second appeal they won. Because the judge should have refused herself. So it is that. My partner is a good fellow now, so. . . I imagine the delight on Judge Cotoy's face when he inherited this case. He was clearly. . . He was. But in any event, my partner sent two letters to the judge saying your notices are deficient. And ignoring that totally, the thing goes on for six and a half years. Again, on the point of fees being caused by a person who is objecting to the fees, the abominable. We had to fight and win on the motions for summary judgment, motions for reconsideration, motions to reopen the purse. As the record indicates, we were ready for trial February 2010. Judge Cotoy was there. We thought we were going to trial. And there had been prior mediation events. And the judge required us to go to mediation again, which didn't go anything. So that we didn't trial again for 15 months. Had to prepare for trial again. Had to do the post-judgment filings. So even if you take, as I did in page 50 and 51 of our brief, these basic things that there should be no question about. Fighting back summary judgment. Preparing for trial. Conducting a trial. Doing the post-trial. Filing the fee petitions. Objecting the motions to reopen the purse. And that alone, regardless of the rate we used, $250, 343 our average rate. My real rate, which is higher than that, which is less than the big firms in Chicago. Almost everything else that was done for five years was disregarded. And most of it was not caused by Mr. Fisher. That, I think, covers the main things. There is also no dispute that this court under 366 took the more fees. 366A5. So as opposed to revamping it, should we agree with you, you would submit that we can take a look at it and award the fee? Absolutely. And the cases we cite are not similar factually or even the underlying legal issues. But they sort of say, this has been going on for a long time, five years, six years. We're going to do it here. Any number of alternatives are suggested. There can't be any question that all the facts were provided in the huge depetition. Exhibit A to that broke it down as best we possibly could into many, many categories, as the judge requested us to do. So we request an affirmance of the factual repeal. Thank you. Thank you. Good afternoon, Your Honors. Pat Costello, appearing on behalf of Conestoga Products. My plan would encourage this court to provide great deference to the trial court on all issues. We are the appellee on two separate issues, basically, on the 2005 forcible and our 2005 MR case for the tortious interference claim. Rather than follow some other outline that I've already designed, let me address, Justice Burke, one of your questions that you had asked Mr. Walden, relative to the Mojitos group. Your Honor, I believe, wanted to know, well, the Mojitos group, while they were aware of the expense, while they were aware of the cost, while they were aware of how much it was going to take from dollar-wise to get this place built, when did they ever show Fox River Commons that they actually had access to that money? And that's a question that was raised in the Reines and Associates case. And one of the things that the court in that case, with a similar set of facts, finding that a landlord was unreasonable in their consent, said, not only is it or, they either have to have the funds or show that they have the capacity to be able to go out and raise those funds. Mr. Rios, when he testified at court, described not only was he planning on raising the funds for this case, he had previously done it for another restaurant when he built Rumba downtown, the restaurant that, as counsel described, was losing money when it first came. Like a lot of restaurants when they started the business, but it's still in existence today. Mr. Rios also testified that he had access to investors, that he was actually using an attorney for one of his investors. And the real world dealings, I think, suggest that when you approach the ground landlord to want to know whether or not they would be amenable to you having this, that's not the last piece of the puzzle. That's got to be one of the first pieces of the puzzle in conducting due diligence. He had already signed an asset purchase agreement. He had already deposited earnest money. He had already done drawings. He had already retained counsel. And then he approaches the landlord and said, this is what our concept is. This is what we'd like to do with this building. We'd like to get your okay with this. They said no. One of the other reasons, as previously has been suggested, they knew. By March of 2005, they knew. They understood this process. They understood what was going on here. Mr. Rios testified about these things, but the question is, did anybody tell Fox River this while this was going on? I mean, Rios can testify only once about all the things he was going to do. Right. But Fox River has the right to say, show us the money makers. Well, I think what Fox River has the right to say is, show us that you have readily enabled tenants. Show us that you have somebody who's actually going to do it. So Cummings and Fishman then produce an asset purchase agreement, and they say, hey, somebody's already signed off on this. This isn't just an idea. They signed off on it. They've already deposited earnest money, to which then Fox River comments, who wants to see if this guy's an operator? Fine. Come down to our restaurant. See us there. See if we actually have an operation, have dinner on us. Come down there. They get to do that. They go down there. They say, you know what? We want to see financials. They talk about the fact that, oh, he just produced this financial statement. They did it because he requested it. They said, we want to see it. Did they ask for financials previous for any of the other? No. They never had it. Nor did they ever ask for construction budgets. They said to Rios, not only do we want to see financials, we want to see tax returns. Not only do we want to see that, we want to know what you think it's going to cost to build this, because we have an idea in mind. Not only does he produce all of that information, they're in agreement with it. They say, yep, this is about how much we think it's going to cost to re-concept this restaurant the way Mr. Rios wants to do it. We're not going to approve it because he's going to show us that he's got this money in a bank account. Well, his concept is, if you're not going to approve me, how do I go up to my investors who I'm already working with, who previously invested with me at another restaurant, and go ahead and get this built? I'm going to tell them, put the money aside, make the investment, set everything up, and then we'll keep our fingers crossed and hope that the landlord, who's already previously rejected at another one, who's produced an internal memo that says, we can really get this property back if nobody occupies it, is going to go ahead and approve it. This was systematic on their behalf. Did you talk about the Smith Group? And I'm just overcoming a heat, and I forgot. But I can go ahead and do that. I think Justice Burke was pointing out the letter that seemed to go. The January 31st letter, which I authored. And after Justice Burke brought it up, I actually went and read it. And really, what that letter describes is there was an asset purchase agreement. There were actually two asset purchase agreements with that entity, with Chicago Franchise originally. There was one entered into an office, and this was brought on through testimony. And that's when Mr. Howley started actually working with Mr. Romero and Fox River Commons to talk about adding a drive-thru out there, reconfiguring a drive-thru for the Nancy's Pizza and the Al's Beef that they wanted to put in. They had architects draw these plans, and they were actually working with Fox River Commons. They worked with the city of Naperville. That kind of got stalled. That agreement ended. In December, there's another agreement that's entered into, and that asset purchase agreement includes a phrase and a statement in there that allows Chicago Franchise to assign, without consent of my client, to a franchisee for purposes of going about operating the building. That gets sent to Fox River Commons, along with a letter from Mr. Marcus, who was the attorney for Chicago Franchise, to Mr. Romero saying, P.S., we know the entity that's going to be the franchisee in this. It's the Smith Group, LLC. There's another conversation where Mr. Romero and Mr. Marcus agree that Mr. Howley and Mr. Smith are actually going to go to Mr. Romero's office, introduce themselves, introduce the concept. Now, these people aren't foreign. Mr. Howley had already been working with Mr. Romero about this drive-thru issue back in the fall of 2004. So in 2005, they get together, and at that time, to start with the letters saying, Mr. Romero testified. He told Howley he wanted a personal guarantee from him. And Howley said, hold on. I've created a franchise, first of all, a corporation to provide myself a very strong personal guarantee. Secondly, I'm assigning this to a franchisee that's going to sign an assignment on a building lease, the fourth down. Mr. Romero. And they're now saying, well, financially, we could never collect the rent from anyone outside of Fishman. It doesn't make a lot of sense. A personal guarantee to what? They had a lease with Fishman. What could Mr. Howley possibly be guaranteeing? Well, why would Mr. Romero ask this? Because as he testified, he didn't understand the nature of the relationship. Part of the stipulated exhibits show that in December of 2004, he sent a request to Connie's to extend the land lease. Connie's wasn't a tenant. They didn't know that. It wasn't until March that he went back and looked at the agreement. He also testified that when he found out that there was a Nancy's and an Alice B going in there, he wanted a new lease. So they were going to enter into a new lease agreement. And raise the rent. Well, I think their argument would be that, well, the guarantee to Fishman so that he's guaranteed to pay off the rent. Well, it seems like that's their argument that, you know, these people don't have money, Fishman's never going to get the rent, therefore we're never going to get the rent. Well, you know, I really have a problem with that argument from there for two reasons. Because I really think they're arguing two different points. First, they're saying, you know, our relationship is only with Fishman. So we can only seek the rent from Fishman. Legally, I don't know that that's true. If you look at section 601 of the land lease, it does talk about that an assignee of this land lease might assume some of the responsibilities or a sub lessee towards Fox River Commons. So I'm not sure that that's completely true. But we never really litigated that point. What they did say is if Fishman had always paid rent to them, no matter what, regardless of whether or not there was an operation out there, regardless of whether or not that building was operated, since 1995 when that land lease was entered into, rent had always been paid. It was never deficient. In the event that it was, they could have exercised their rights under 601 and gone to Bertucci's first and said, you know what, under 601, you're the assignee, you're a sub lessee of this property, pay us rent. Then they could have gone to Connie's Pizza. Then they could have gone to Connie's Food Products. Then they could have gone to the Smith Group or whomever was on the hook afterwards. Arguably they could have did that. They never did. I think they have to pick a leg really on this. Either the financial security of the tenant requiring them to sign a personal guarantee was important, or alternatively, they could have always sought the rent from Fishman. If they could have always sought the rent from Fishman, there is nothing up until 2008 that they should have ever been concerned that Fishman would be anything but able to pay the rent to them. So the land lease is only between Fishman and the Fox River Towns? Correct. Then tell me, how do you get attorney's fees on the 05 eviction if you got a signatory to that land lease or a party to that land lease? We get attorney's fees on the 05 not pursuant to the land lease, but pursuant to the assignment and assumption agreement that was entered into in 2004. In this lawsuit, did this 05 eviction arise out of the assignment? Because that's what the language in the assignment says. Correct. Arises out of. Did it arise out of the assignment or the lease? Well, it's our contention that it did, Your Honor, because only by that assignment is County's Food Products entitled to possession of the property. And the only thing that Fox River Commons was attempting to do relative to County's Food Products, although I guess I shouldn't say the only thing, because the form complaint for the 2005 forcible does include a request for an assignment and assumption agreement. The only relationship we had relative to a signed document was between Fox River Commons and County's Food Products assignment and assumption agreement, which provides in paragraph seven, that a prevailing party for any litigation arising out of this document shall be entitled to attorney's fees. That's our contention on how we're entitled to attorney's fees under the 05 forcible. I did hear a beep. Nobody else paid any attention. Okay. Then I'll keep going, because there are a couple of other things I'd like to point out. One of the things that Mr. Lacey told the court, Your Honor, is we're questioning him about the damages award to County's and the damages award to Fishman. And he told the court, he said, the trial court actually got it right the first time before the motion to   the trial court actually got it right the first time before the motion to reconsider relative to the rental damages. I don't think that's, I don't really think that's what he wanted to say, because actually if you look at the judgment order that was entered by Judge Polkjoy in July of 2011, it awards County's Food Products $590,000, $590,862 in rent. What the trial court did then in its original order was put a parenthetical and said that shall be a credit towards Mr. Fishman. We filed a motion to reconsider, which Judge Polkjoy granted. And on that motion to reconsider, Judge Polkjoy admitted, I misunderstood the timing of this. The $590,000 represents from the period of time of January of 2005 till the end of March of 2008. The amounts my client actually wrote checks for on a monthly basis to Mr. Fishman. Mr. Fishman's award, alternatively was from May of 2008 through May of 2011, the date the County's lease would have expired, originally the Bertucci's lease, but signed the County's would have expired. Judge Polkjoy awarded us all the amounts of rent that we paid. He thought it was supposed to be a credit towards Fishman because they were a double amount. When that was brought to his attention on the motion to reconsider the transcript of that November, I guess it was November 3rd, 2011. Clearly he says, I made a mistake. I misunderstood the timing. I'm awarding rent and it wasn't a double effort. It was a rent to two different parties for two different periods of time. That's proper. And that's our contention that counties is entitled to those amounts as it's damages. Had Fishman approved the assignment to the Smith group in 2005 of January, they would have had to pay rent this morning. They wouldn't have had to pay rent. They paid rent every single month. They've argued that, well, we retain the right to possession. And I'm a case law here. If you're in possession, you should pay rent. That case law that they cited is case law between a landlord and a tenant. It doesn't have to do with the type of tort claims that we've made, that we've prevailed on at the trial level. Our damages are, what position would we have been put in had no breach of their duty occurred, had no tort occurred in January of 2005? Undoubtedly we would have received the $25,000 under that agreement. Or if the court finds that we wouldn't have gotten it from Smith, we would have got $200,000 better for counties for the Mojitos group. They wouldn't have had to pay rent. Every month they made payments of rent to Mr. Fishman. That was introduced as an exhibit. And the court awarded all of those amounts. They've also argued, well, we know you got the benefit of the property. As I argued, one, that issue was really never raised at trial. And part of the reason why it was never raised at trial is because there is no evidence that we derived any benefit from that. My clients testified at the trial level. They were losing a fortune on this property. They introduced documentation that showed that they were losing somewhere between $30,000 to $40,000 a month by trying to operate this property in mitigation of their damages. They were attempting to. They didn't want to be in breach of the lease to Mr. Fishman. They didn't want to go out of business and stop paying him. They had produced two, and then later a third, possible new tenant to take over this building and start paying Mr. Fishman, with Mr. Fishman continuing paying. And the latter one, the ground runner, unreasonably refused to consent. And as a result of that, we were damaged. We also asked for additional expenses at the trial level. We asked for all the reconcepting expenses to $727,000. Trial court denied us. They said, that's on you. But the rent, the trial court awarded, because that is directly related to the refusal to consent. Thank you, Your Honors. Thank you. Should I begin, or should I field questions first? As you wish, Mr. Proctor. Just a couple of points. Karen refers to the purchase agreement and how they agreed in the purchase agreement that Mr. Howey could assign the lease. Well, it's great that Mr. Howey of Chicago Franchise and County of Greenstead agreed. Unfortunately, the landlord was imparting to us, and is not giving a party to us in that obligation under the terms. Your clients apparently do a lot of real estate, commercial real estate. Is it typical for a, for instance, a franchise, when these come in, is it typical for the people in Columbus, Ohio, to sign the lease as opposed to the person who's the franchisee? You know what, Your Honor, it works both ways. It depends on the company. And this was actually raised at trial because we had said that Mr. Howey, something else that's been lost here, is we specifically said, Mr. Howey specifically said, if he had signed the assigned consumption agreement, it would have gone through. The deal would have gone forward. And that assigned consumption agreement is what they're referring to now as a guarantee. Okay? The assigned consumption agreement, if he signed it, landlord would have approved it sometimes. Okay? We testified to that. I guess my question to you is, is it reasonable to expect that somebody that owns franchises and sells franchises, is it reasonable to expect them to sign leases all over the country where they're selling their franchises? Some do. And the reason for it is if the tenant goes bad, there's a good location, they still confirm the location. They got a real good location. They'll actually put them out before the landlord. Is that all cases? No. Does that happen? Yes. Mr. Howey was actually asked about that at trial, that these guys, if you're so convinced they're so wealthy, why don't you just for this one time sign it? You're the guy that had access to all the records. You're the guy that's convinced they're wealthy. Why don't you just sign this assignment? And he said, no, that's not what he does. That's not his business model. And that's true. Some franchises just do not do it. Another issue Mr. Costello had raised that Fox River was looking to maybe, because it was a dual franchise building, to ask for additional rent or a new lease. He never asked anybody about that. That is an internal document that was solicited a month between him and the people at Fox River. And that's his job. Okay, all right, we've got a new opportunity. What can we do? As it turned out, they couldn't do that. And they never approached Howey or the Smithsonian to mine that money, nor is there any evidence in the records that they wanted to redo the lease. As far as the other Smith restaurants, okay, the case law says, and I refer to the Gulf Labs case, the other guy wanted to lease a space and shopping center. And the landlord wouldn't let him take his land. He wanted different terms, more money. And the reason he got off money, he said, well, you're not financially qualified. He went to another shopping center, similar space, gave that shopping center the same transfer information he gave the first guy, and the second guy approved it. And in that case, he said the first guy don't even do it without his consent. That's not what happened here. Okay, Smith's group went and bought other restaurants. But there's a little bit, first of all, what information did the Smith group give the subsequent landlord? If the information that he gave the new guy is the same information he gave to Fox River, that argument doesn't hold water. They both have to have access to the same information. Secondly, was it a similar situation? In this case, they were asking the Smith group for a significant amount of money, and were building somebody else over. Oh, Brad, I'm sorry. You can hold that up to a certain point. Now they make the argument, well, they spent $600 and some thousand dollars elsewhere. Well, if you spent $600 and some thousand dollars elsewhere, and they were going to own the brick and mortar, own the building, it's a different situation. You could get somebody to lend you money to build the building. You may not get somebody to be able to borrow that much money to put it into somebody else's building. So unless you can demonstrate that the situations are the same, that the information provided was the same, that the financing is the same, that the corporations are the same, that the investors individually that were going to invest in the Fox River site are the same investors that are going to invest in the other site, you can't say all that. The fact that the other building was built according to the road, it may include the say-it-is. We don't know how big the issues were. We don't know how it was financed, where they financed, where they made leases if they owned the property. None of that is interactive. Your client received financial information from the Smith Group, correct? The only financial information he got directly from the Smith Group was a letter that said we had $500,000. Did your client get any financial information from Chicago Franchise? No, sir. We did not provide that. Then why do you say that if Chicago Franchise had signed the Assumption Assignment Agreement that everything would have been fantastic? They were okay with Chicago Franchise because of the multiple operators. You had Bertucci. They had no idea about the franchise. He said $500,000. I'm not talking about Smith, I'm talking about Chicago Franchise. No, Chicago Franchise was similar to Bertucci, who was the national chairman. We didn't get any financial information from him. You had Connie. He was a well-known operator in the Chicago market. Bertucci owned this company, owned several salons there. They were familiar with Connie's operation. He wanted to sell it to Connie's food products with his child. They were okay with that. The old man was still behind it. Okay, they go to Smith. When they asked Smith, they went to Howie. Howie owned several franchises. Several of them not owned, but franchised in several. They were familiar with his operation from their business at Big Chap and some of them. They were comfortable with him. They had seen his operation. The problem was when Howie, who was an experienced operator, says, hey, he's a good guy, he's got a lot of real estate investors. He won't do enough for me to stand by him. He's okay for you. Yeah, we have problems with him. And that's why they asked for financial information from him. So, you know, if you look at the Jack Frost case and look at the test, in that case one of the ‑‑ no, I'm sorry. It's the Brand and Associates that the proposed assigning met quote, unquote, commercially reasonable standards. You didn't find that Smith or anyone else met commercially reasonable standards, or was it your own standards? No, our viewpoint was what they wanted to do, there was no guarantee of liability. I mean, our estimates were no cost overruns. We're almost $500,000. Well, you know, the counsel for Connie made a good point. You say that the only people, the only person that could collect the rent if it wasn't paid from the assignees was fishing. But then you say we can't ‑‑ we don't like the financials of these other people, therefore we're not going to rent to you. You know, aren't you cutting it both ways here? If they don't pay fishermen, we don't go pay. And that's exactly what happened. Connie started paying fishermen, fishermen started paying us, and we filed a second lawsuit. I mean, we don't want to get in the chain. I mean, technically, Connie's doesn't pay, Connie's food products shouldn't pay, Connie's pizza should pay, Bertucci's should pay. But I don't think Connie's pizza or Bertucci's have made any payments to Mr. Fishman. And they're the prior assignees. They're saying sue me. And there is a lawsuit in Cook County against Bertucci's, against Connie's pizza. It's one thing to have the right, but nobody wants to volunteer and involve themselves in a lawsuit that they don't have to. If you can avoid it, you avoid it. And that's what we're trying to do here. They have said, Mr. Costello, I believe, that Connie's gets their attorney's fees in the ultimate eviction under the Assignment of Social Agreement, do they? Well, that's the way to go there. I mean, there are two types of documents. The Assignment of Social Agreement doesn't have anything to, technically, to land where he can stand to be signed by fishmen to the county, that he consents to it. Okay? And that consent and the obligation under that Assignment of Social Agreement was fulfilled. That's why Connie gives him possession. He agreed to the assignment, and then Connie took possession of the property under the sublinks, not under the Assignment of Social Agreement. The Assignment of Social Agreement says the wrong word. I won't object. Fishman says, now you're my tenant. He took possession under the sublinks. He did not take possession under the Assignment of Social Agreement. So the eviction, you're saying, does not arise out of that agreement. That's correct. It doesn't. It arises out of the sublinks. I believe that is a fair interpretation. Yes, Your Honor. Was Connie contributing a contract with Fox River? No, and I believe that you read the Non-Disturbance Agreement that specifically says that there is no direct relationship between the subtenant and the landless owner. As far as I may quickly move on to a little bit of an attorney's view. I just have one question. You had said in your original argument that the proposed assignee would have to be ready, willing, and able. That means to have the funds now. Counsel for Connie said it's have the money now or be able to raise the funds in the future, which is correct. Yes. Well, to say I have to have a check and be able to write it, no. There is case law that you have to be able to marshal funds. Okay, in order to, I've got to liquidate stocks, or I've got to sell them to investors in order to put our money together. But there has to be some source of funds. There were no investors here. Rios claimed that he hired a guy named, I think it was Scott McKibbin, to go out and find the money. There's never any testimony that the guy that invested, Jack A. Rumble, would have been the same investors that invested in the Mojito Group. Maybe they were, maybe they weren't, but there was no guarantee to that. That's why you had to hire the third person, or talk to the third person, who is an acquaintance as well as a business associate, and to go out, and he would have to walk and look for the money. Now, at what point in time do you say, you know, I can't find it? There was a due diligence period under this purchase agreement. Okay, that's whatever it was. I don't remember. 30, 60 days we could go out and shake the bushes. The fact of the matter is, regardless, they never came back to Fox River and said, No, we're not using debt. We're going to find equity. He said that to Mr. Pastel. I don't know whether that ever got back to Fox River. I don't believe there's any testimony to that. And regardless of whether it did, at the time of trial, Rios did not know what to do, or who any of the investors were. He was going to have somebody go out and shake the bushes. I mean, you've got to have more than, hey, I'm going to go find it. I mean, if that's the case, anybody needs the financial aid. I don't have it now. I want to get somebody. You know, give me a couple years. I'll loan them some money. But if the landowner is saying, I'm not going to consent, then how easy is it to find investors? No, the landlord didn't say consent. The landlord said, if you've got the money, okay, we'll prove it. But you don't have the finances. Okay? Now it's important to have the money to build it and be able to operate so you don't have a debt facility. But if these guys start the project, run out of money and don't finish, okay, he's got a building that's not finished with liens, what have you on it. It's already been topped the lease. How are you going to get that property up and running regardless of who owns it? What's the prospect of somebody coming into that situation? It's imperative that they have the money to do what they want to do. And I would also take issue with Tom's recommendation that the landlord said, you need to come in with this construction plan. Landlord asked for some answers. Landlord didn't ask them to come up with your, this was his proposal to come into the property. No one ever said we have to spend a million dollars to redo this building. Okay, that is not a requirement to review Mojito's application to come into the property. As far as the 20C fellow judge, just quickly, it opens your eyes when he says, you know, our award will be reduced by 78%. You should also open your eyes when you figure out it was reduced by 78% and still twice as much as the other guy got. The fourth of all, 2005, this is all in my briefest part. I guess my point is, I understand it's difficult. I mean, no disrespect. You have a case going on in Cook County. They have four cases here. Some of them qualify for attorney fees, some of them don't. I get it's difficult. And I think, in light of that, Judge Popejoy went line by line over it, describing what he saw. He went through a great deal of time. He clearly gave a great deal of thought. And this is how he came out. And I think a great deal of deference should be given to that. I mean, I don't want to, I did go through the numbers somewhat in my brief, and I think they're accurate. But I think the one final point I'll make on that is that the issue is hours. I'm sorry, say that again. Hours. How many hours for that? I mean, look at this. I mean, he will work and constantly fetch issues out of his control. And he's addressing that issue. He forgets that. He filed a motion in court to sell him at the minimum of the value. He amended his complaint to add $10 million to his individual repayment. He will be moved to stand for motion to dismiss. And nevertheless, he really lost the motion. And for a settlement agreement, he amended his complaint for specific performance of the agreement to the court. It was not enforced. So not all the cause were the fault of Fox River. Similarly, with the appeal, I only raised this issue because, granted, guilty. I was premature when I filed the first appeal. But, you know what, they didn't have to respond to the appeal. They could have filed a motion that was immediately dismissed. Rather than that, they also filed their brief. So, yeah, I was wrong, but I'll understand that by myself. But the last issue is the hours. I believe in the brief Mr. Wolfensohn had said $2,000. I don't question that. But what I do question is, if you take the county's total amount of $98,282 and you divide it by his $225 fee, you come out, I think, somewhere around $440. So my question is, why five times as much time? Money not withstanding, why did it take five times as much time? I mean, they were both involved in the forcible. They both had a breach of contract claim. County didn't prevail. Fishnet did. They both had tortious interference claims. Well, the tortious interference claim was one in breach of contract. Well, he's on the same set of facts. Was there, was there not a reasonable consent? It's not like a great deal more money was spent because there were additional counts. So I would just think, taking all these things into consideration and the amount of time Judge Polkjoy took, and if he has a chance to say, hey, this is what I think is reasonable or customary, one line by line, put a great deal of thought, I think a great deal of effort should be given to that, I think the attorneys he's awarded were appropriate. And if there are no questions, I thank you for your time. Thank you. Thanks so much. Thank you, all of you. Thank you very much. Oh, I'm sorry. Did you get to me too? I got to me too. Sorry. I just had a couple of points. On the last issue, the comparison of counties, Mr. Fishman had more issues. You know, he was, and we've never seen a case where he had the land lease and you're the tenant under the land and the landlord under the building and all these things going on. Counties was not in the 2008 forcible. So it was not identical. Secondly, another factor that enters into the consideration of fees and benefits, the client. And the judgment award is there. In addition, Fox River saw $319,000 in the unpaid rent, which was defeated. And so Mr. Fishman avoided that as well. That was kind of the material breach doctrine, first of all. The final point, and all these things are on there in the brief, in terms of determining the reasonableness of the fees, cases say you look at what people pay. So not only was it Mr. Fishman's fee agreement and the affidavits attached to the fee petition, which we're not objected to, was that these fees were paid by other clients of our firm, that they were less than the big firms in Chicago. And in addition, and this wasn't mentioned, pursuant to Article 15 of the building lease, the tenant, counties, counties of Bertucci's, are required to indemnify Mr. Fishman for fees incurred by things caused by them and so forth. Various bills were sent to counties and they made several payments. And they stopped, but they made several payments at the normal billing rates without questioning them. So that's further evidence. And here's an outsider making payments. And the cases say making payments demonstrates reasonableness of rights. So we rest on everything in our papers. And we thank your Honor for all this time. Thank you, John. Thank you very much.